RICHARD E. WEISS *et al.*, Objectors-Appellants, *v.* DOROTHY M. WEISS, Ex'r of the Last Will and Codicil of Emil F. Weiss, Deceased, Respondent-Appellee.

Second District   Nos. 82—455, 82—648 cons.

Opinion filed March 15, 1983.

794

William C. Murphy and Patrick M. Flaherty, both of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellants.

Oliver S. DeBartolo, of DeBartolo & DeBartolo, Stuart L. Whitt, and Matthews, Dean, Eichmeier, Simantz & Hem, P.C., all of Aurora, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Emil F. Weiss died testate; a codicil to his will named his daughter, Dorothy M. Weiss, executor. Emil's will devised and bequeathed all of his real and personal property in equal shares to his four children: Dorothy, Richard and Robert, and Marilyn Nowak. The codicil empowered Dorothy, as executor, without order of court:

"***(a) to settle claims in favor of or against my estate; (b) to sell at public or private sale any real or personal property owned by me at the time of my death, without application to or confirmation by any court; and (c) to make distribution of my estate wholly or partly in cash or kind, and the determination of my executor as to the value of any property distributed in kind shall be conclusive."

This consolidated appeal arose after the trial court overruled Richard, Robert, and Marilyn's objections to Dorothy's final account and report, and after the court later authorized her to defend the appeal using estate funds upon her petition for the court's instructions on that matter.

At the hearing on the objections to the final account, Dorothy was called to testify under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60, recodified as Ill. Rev. Stat. 1981, ch. 110, par. 2—1102) and the following facts were revealed. Emil's attorney, Leon Weiss (a cousin), predeceased him, as did Emil's wife seven months earlier. Dorothy was unmarried, and resided in the family home in Aurora with her parents before their deaths. Her married sister, Marilyn, lived in Wisconsin; her brothers, Robert and Richard, lived, respectively, in Shreveport, Louisiana, and Aurora, Illinois. Leon Weiss had been handling Emil's wife's estate and when Leon died, the file was passed on to attorney Peter Grometer. Upon Emil's death, Grometer was consulted by the four heirs concerning the estate. A dispute arose between Dorothy and her sister and brothers concerning how long she would be allowed to stay rent-free in the family home. Dorothy requested four months; the others felt three months was a reasonable amount of time. Dorothy, a teacher, indicated the additional month would allow her to stay until June and school would be out for the summer, so she would have time to consult some financial people about whether she could afford to buy the house and whether it was a wise move.

Dorothy neither denied or affirmed that she had a conversation with attorney Grometer in which she told him that she was "going to go elsewhere for a lawyer to whom [sic] will protect my interests." Dorothy eventually secured the services of attorney Oliver DeBartolo.

She denied she consulted with attorney DeBartolo about her own personal interests as well as the affairs of the estate. She testified the controversy was between her brothers and sister on one hand, and herself as executor on the other.

The arguing began the night of her father's burial; the controversy about the personal property was that "[she] wanted certain things and [her brothers and sister] wanted certain things *** ," causing her "many sleepless nights."

The other major controversy was about the sale of the house. The price of the house and its sale to Dorothy was agreed upon in a "Weiss Family Settlement Agreement" which was drafted by attorney William Murphy, who represented Robert, Richard and Marilyn. The agreement was signed by Dorothy individually and as executor. She testified she never consulted with attorney DeBartolo as the buyer of the house, only in her capacity as seller. They discussed whether there was clear title, DeBartolo obtained a title commitment, attended the closing, and took the deed to Geneva to remove some title exceptions, and he recorded the deed. She represented herself at the closing. From the date of her father's death to the present, she had not received a bill from DeBartolo for services rendered to her personally, nor did she expect to receive one.

She consulted with DeBartolo a "couple of times" when the family agreement was drafted and redrafted, but not concerning her individual interests except insofar as the discussion led to the hiring of Colonel James G. Quick, an auctioneer, who conducted a lottery in order to distribute the decedent's personal property. She recalled the lottery method was suggested either by her brother, Richard, or Colonel Quick himself. Colonel Quick's bill for $1,271 was not paid because both she and the other family members objected to the amount of the bill, and were not happy about it. Colonel Quick spent "no more than an hour" to appraise the furnishings, and then spent about 4½ hours conducting the actual lottery. Dorothy agreed that in addition to the necessary filings and court appearances, her consultations with attorney DeBartolo concerned the division of the furniture, the family settlement agreement, and the sale of the house.

Dorothy testified the codicil to her father's will gave her unlimited authority to distribute the personalty. She resorted to Colonel Quick's services because there were "so many arguments it could never have been settled fairly any other way. [She] never knew of a fair way to settle it in the first place." She agreed that during the many, many discussions she had with her brothers and sister concerning the distribution, that DeBartolo was not present, nor did he consult with her

about her financing plans to buy the house. She did not recall whether he had advised her about the amount of monthly rental she was to pay for living in the house; she said her brothers and sister set the rental fee. He advised her to get three appraisals on the house, and they compared them to see what a reasonable price for the house would be. She then negotiated the sale with the family through her brother, Robert, amidst "many, many miserable calls and constant threats from her family." She recalled that DeBartolo felt that the final price, $82,000 was "outlandish." An appraisal of the real estate appended to the decedent's State inheritance tax form showed the property was valued at between $72,000 and $75,000 in May 1980. She testified her brothers and sister did not respect her as executor and resented her being the executor.

Attorney DeBartolo told her she would be entitled to deeds from each of her brothers and sister and their respective spouses at the closing. He advised her as to whether she had clear title; she did not believe he had rendered her personally any advice, only in her capacity as executor. Attorney Grometer had advised the family that it would cost more to have a bank act as executor than if she were executor; also, Richard rejected Marilyn's suggestion that he be the executor. No objection was raised concerning Dorothy's fee as executor.

On recross-examination, Dorothy testified she did not discuss with DeBartolo the continuous threats and harassments she was subjected to by her family; she felt DeBartolo had been informed of the controversy by Mr. Grometer when the file was turned over.

Attorney DeBartolo testified and his time sheets on the Weiss estate were admitted in evidence. He stated there were instances when he discussed individual matters with Dorothy Weiss, but he deducted that time and only charged the estate for the time he spent on estate matters. He stated that although he advised her on individual matters, he was not charging her for that, and kept no separate time sheet. He could not estimate what percentage of the total time he spent on the estate was spent in connection with the division of personal property and the sale of the house, including the family settlement agreement. He stated he did not talk with attorney Murphy concerning any of the routine estate matters.

Attorney DeBartolo testified that just prior to the lottery, he prepared an interim accounting on the demand of Mr. Murphy's three clients. He made it clear to Dorothy at the outset that he would be representing her as the executor of the estate, not individually. After the closing, DeBartolo took the deed to the title company for recording and clearance of certain objections. He did not recall advising Dorothy

on the language of the family settlement agreement; he relayed corrections or amendments from her to Murphy. He did not recall her ever discussing with him the threats or harassments she received from her family.

Dorothy's sister, Marilyn Nowak, testified that at an initial meeting with attorney Grometer, Dorothy said she had to find someone who would protect her personal interests. She also testified that at the meeting with Grometer the day after her father died, Dorothy was upset by Grometer's suggestion that three months was an adequate amount of time for her to either decide to buy the house or make arrangements to live elsewhere; Dorothy wanted a year to do it. Ultimately, Dorothy was allowed four months rent-free during which time the estate paid the utility bills.

The objectors sought leave to amend the objection on its face to include an objection to Colonel Quick's bill, which was equal to 25% of the value of the personal property.

In closing, the objectors argued that half of the $4,500 attorney fees should be borne by the executor personally. DeBartolo argued in response that perhaps 90% of the time he spent on the controversies concerning the furniture, the house, the payment of rent, and the closing resulted from the unreasonable attitude of the objectors. He argued he did not feel he rendered any service to the executor as an individual, and that the cost of his services should be borne by the estate so that each of the heirs will pay a portion. The objectors responded in argument that the heart of the matter is precisely the fact that the controversy existed between the executor and the other heirs, and that she should have had independent counsel.

In its ruling, the court below considered that it would not have been possible for the executor to have performed her duties without the attorney clearing the outstanding objections to the real estate title when the deed was to be recorded, or without the executor understanding the terms of the family settlement agreement. Further, the court found that, as executor, Dorothy had the absolute power to hire Colonel Quick in order to divide the personalty. Accordingly, the trial court overruled both objections to the final account.

Thereafter, in ruling on the executor's petition for instructions, the court directed the executor to defend the appeal, to select and retain counsel for same, and to pay the costs incurred in such defense out of the estate assets. The matter of payment of attorney fees in connection with the appeal was reserved for future determination. The appellants appealed from these orders and the appeals were consolidated.

Three issues are presented: (1) Whether it was error for the court to approve the executor's final account and report granting a $4,500 fee to the executor's attorney where the evidence failed to show that the attorney's services were performed for the benefit of the estate; (2) Whether it was error for the court to approve the executor's final account and report which included a $1,271 auctioneer's fee when the evidence did not show that the fee was usual, reasonable or customary; and (3) Whether it was error for the court to direct the executor to defend the judgment on appeal and to pay the costs of such defense from estate assets.

■■ Appellants point out that the issue at bar is not the reasonableness of the amount of the attorney fees but, rather, that the court should have directed the executor to pay 50% of the $4,500 attorney fees which were rendered for her own personal benefit. They charge that the executor used her position as executor to secure free legal services for herself personally. They term her purchase of the house and participation in the personal property division "classic conflicts of interest." They emphasize that an executor of an estate serves in the same fiduciary capacity as a trustee. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 261.) An executor must act with the highest degree of fidelity and with the utmost good faith; "but *** is held to the exercise of only that degree of skill and diligence which an ordinarily prudent man bestows on his own similar private affairs." *Christy v. Christy* (1907), 225 Ill. 547, 552-53.

Appellants do not dispute that the fact the executor has a personal interest in the estate is not enough, standing alone, to disqualify that person as executor. (*In re Estate of Kuhn* (1967), 87 Ill. App. 2d 411, 420.) They contend here, however, that Dorothy abused her position as executor and breached her fiduciary duty of undivided loyalty by having the attorney she hired as executor charge the estate entirely for his services, even though she received legal advice in her dual capacity as buyer and seller of the house. Appellants assert they are entitled to recover the profit realized by the offending executor as the result of such a voidable transaction, as well as recovery of their expenses in remedying the breach of the fiduciary duty.

Appellants find Dorothy's breach of fiduciary duty analogous to that which occurred in *In re Estate of Glenos* (1964), 50 Ill. App. 2d 89, and *In re Corrington* (1888), 124 Ill. 363. The executor in each case was found to have breached his fiduciary obligation after selling real property of the estate through a crony (*Glenos*) and to a son (*Corrington*) at a lower price than the evidence showed it would have brought but for the representative's breach of duty. Appellants fur-

ther suggest that when Dorothy's individual interests conflicted with her duties as executor, she could simply have hired her own lawyer and disqualified herself as executor. They contend she should now "pay the bill" for her failure to do so.

■ Appellants correctly point out that before attorney fees may be charged to the estate of a decedent, they must have been incurred in such a manner as to be in the interest of or for the benefit of the estate. (*In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 979; *In re Estate of Lipchik* (1975), 27 Ill. App. 3d 331, 336; *In re Estate of Breault* (1965), 63 Ill. App. 2d 246, 254.) They assert that the uncontradicted evidence at bar is that the attorney performed services for the executor individually in both the purchase of decedent's home and during the "bitter disputes" concerning the division of the decedent's personalty. They state that to allow the executor to "escape charges for legal services as buyer because she is also seller is neither good common sense nor good law."

The record is clear that Dorothy, individually, did not receive a bill from the attorney for his services to her in negotiating the "Weiss Family Settlement Agreement." It is pointed out that the cost of those services should not be borne by the estate since the estate as such had no interest in which beneficiary in particular took which asset, so long as the proceeds of the estate were distributed in equal shares pursuant to the terms of the will and codicil.

Appellants conclude the executor failed to sustain her self-stated burden of proof as to the propriety of the charges sought to be assessed against the estate, and thus, the court erred in overruling their objection thereto.

Appellants similarly conclude the court erred in approving the auctioneer's fee. for $1,271 when the evidence failed to show the charge was usual, reasonable, or customary as was the executor's burden to show in the face of objections. (*In re Estate of Glenos* (1964), 50 Ill. App. 2d 89, 97.) This burden of proof is akin to that borne by the executor when his fitness to remain in office is challenged. *In re Estate of Lucas* (1978), 71 Ill. 2d 277, 281-82.

Accordingly, appellants ask this court to reverse the trial court's order approving the executor's final account and report entered on May 24. For the same reasons, they also seek reversal of the trial court's order of July 9 authorizing the executor to defend the appeal, and to pay the costs of the defense out of the assets.

■ As appellee, the executor asserts that the only question before this court is whether the trial court committed manifest or palpable error in approving the executor's final account and report. She

points out that section 27—2 of the Probate Act of 1975 allows reasonable compensation for a representative's attorney. (Ill. Rev. Stat. 1981, ch. 110½, par. 27—2.) The determination of what is reasonable compensation lies peculiarly within the broad discretion of the circuit court (*In re Estate of Bonnett* (1977), 52 Ill. App. 3d 393, 398), and each case must rest on its own facts and circumstances. (*In re Estate of James* (1956), 10 Ill. App. 2d 232, 241-42.) It has been established that an allowance of attorney fees will not be disturbed or altered on appeal absent manifest or palpable error, or an abuse of discretion. *In re Estate of Marks* (1979), 74 Ill. App. 3d 599, 604.

The executor disputes the appellants' allegation that the attorney's services were not performed for the benefit of the estate. She points out that the attorney's services in reviewing the family settlement agreement benefited the estate in that compliance with the decedent's last will and codicil thereby was assured, and that the interim accounting prepared prior to the lottery was performed at the behest of the appellants, not the executor. She points to evidence in the record that she personally sought appraisals as to the value of the property and negotiated with her family in arriving at the final purchase price. Further, she notes that no broker's commission was necessitated by virtue of her purchase of the house, and that it was an obligation of the estate as seller to make sure there was clear title. She notes that the attorney's preparation of the closing statement, attendance at the closing and removal of certain exceptions before the deed could be recorded, were all contractual duties to be performed on the part of the estate as seller.

In sum, the executor contends the evidence shows no manifest or palpable error which would permit reversal. We agree.

With regard to the auctioneer's fees, she points out that under the terms of the will and codicil her determination as to the value of any property distributed in kind was to be deemed conclusive. Yet, the bitter dispute which erupted between her and her siblings necessitated the execution of a family settlement agreement which was prepared by her siblings' attorney. The agreement included the employment of Colonel Quick and, if necessary, use of his valuation figures for certain of the personalty. She contends approval of the fee for Colonel Quick's services was within the court's discretion and no abuse of that discretion is shown in the record. Accordingly, she seeks this court's affirmance of the trial court's order approving the final account and report, as well as its order of July 9, 1982, authorizing her to defend the appeal and pay the costs of the defense from the estate assets.

Our review of the record leads us to conclude that the trial court's judgment was not manifestly and palpably erroneous and the cause must therefore be affirmed.

Although the "Weiss Family Settlement Agreement" was admitted into evidence during the hearing, and all parties acknowledge its existence, none seems to pay any heed to its plain terms. The agreement was signed by the executor in her capacity as executor and as an individual. Therein it is stated that the agreement is entered into in order to preserve family tranquillity and good relationships, to finally and forever settle all controversies between them arising out of the estate and property of the decedent, and to avoid the expense, delay, and uncertainty of long, continued litigation. Therein the parties agreed to transfer fee simple title to the house to Dorothy for the gross price of $82,000. Applied against that figure, she was to receive a credit of 25% against the net sale price after the deduction of all prorations and title expenses which were attributable to the seller which were to be borne by the estate of Emil F. Weiss.

The parties also agreed that Dorothy would not accept an executor's fee in excess of $1,300; her final executor's fee of $1,500 has not been challenged in this appeal. Further, Dorothy, *as executor*, agreed that her lawyer, Oliver S. DeBartolo, would not request or accept fees for acting as attorney for the estate in excess of a certain amount. The exhibit included in the record was only a copy of the agreement, and the space for the maximum fee amount was left blank. Consequently, it is not known whether the $4,500 requested as attorney fees on the final account was over the maximum agreed amount or not. In addition, Dorothy M. Weiss, *personally*, agreed to pay Oliver S. DeBartolo for "any services incurred in negotiating and executing this agreement *personally*, without any claim against any other party" thereto, and the other parties agreed to pay their own counsel as well.

Several facts are indisputable: all parties to the agreement knew the executor, Dorothy, would be selling the house on behalf of the estate and that DeBartolo was the attorney for the estate. All parties knew Dorothy was also the buyer of the house, and that she, personally, was to pay DeBartolo for his services to her in negotiating and executing the family settlement agreement.

■ It has been established that family settlement agreements are especially favored on grounds of public policy upholding the honor and peace of families (*Ham v. Marshall* (1964), 46 Ill. App. 2d 92, 96), and such agreements are enforced by the courts and act as a bar to subsequent attempts to litigate matters covered by such agreements. *In re*

*Estate of Swanson* (1981), 102 Ill. App. 3d 104, 107.

■ In the case at bar, the record provided this court by the appellants does not show whether the $4,500 attorney fee exceeded the maximum agreed to by the parties for DeBartolo's representation of the estate, nor do we seriously mean to suggest that inclusion of that figure in the record would have been dispositive of the issue at bar. At most, it would have provided some measure of the fee's reasonableness, an issue which has not been raised by appellants. In our opinion, the evidence adduced at the hearing shows no palpable error in the trial court's conclusion that the attorney's services in connection with the sale of the real estate were services necessitated by the estate as seller of the real property. The court considered that one of the services provided by the attorney—the recording of the deed in Geneva—was arguably a service performed for Dorothy's benefit as buyer rather than for the benefit of the estate. However, the court found that to be of no moment in view of the fact the attorney testified he had to be in Geneva to clear some objections on behalf of the estate before giving clear title. We agree with that assessment. The testimony at the hearing clearly showed Dorothy sought financial advice independently of Mr. DeBartolo concerning her ability to purchase the house and the wisdom of doing so. She independently sought three appraisals of the property and then negotiated herself the price of the house with her family through her brother Robert. Certainly she had an interest in the price of the property and clear title thereto in both her capacities. Undeniably, as seller of the real estate and co-beneficiary of the estate, she was actually chargeable with a one-quarter aliquot share of the attorney fees shown on the final account and report.

The appellants appear to suggest in their brief that Dorothy should have secured her own personal counsel and disqualified herself as executor when it became apparent that her individual interests conflicted with her duties as executor. Appellants, however, with access to definitive statutory means of removing her for cause (Ill. Rev. Stat. 1981, ch. 110½, par. 23—2) did not seek her removal. The record shows, in fact, that appellants considered and rejected alternate executors, after being advised by attorney Grometer that it would be more expensive for a bank to act as executor, and after Richard Weiss rejected his sister Marilyn's suggestion that he serve as executor.

■ It has been stated that the purchase by an administrator of property belonging to the estate of which he is administrator is forbidden.

"Such a transaction the law deems fraudulent, for the reason

that the interests of the buyer and seller in a contract of sale are opposed, that the administrator acts in a fiduciary relation in making the sale, and he ought not to be exposed to this conflict of interest in selling as trustee for the estate and buying for himself." (*Schultz v. O'Hearn* (1925), 319 Ill. 244, 247.)

It has also been stated:

"Such a sale is not, however, void but only voidable. The heirs have their election to let the sale stand, or by taking appropriate action within a reasonable time to have it set aside. They must act promptly when they are not under any disability and are acquainted with the facts if they would insist upon having the sale set aside." *Schultz v. O'Hearn* (1925), 319 Ill. 244, 247.

In our opinion, the appellants may not now assert that Dorothy's dual capacity as buyer and seller of the property compromised her integrity in her fiduciary relationship with them as beneficiaries. The record does not show that she took bad-faith advantage of the good services of the attorney for the estate as a result of her dual posture. It is not extraordinarily unusual for a purchaser of real estate to represent himself or herself in the transaction. Granted, such a buyer's inexpertise often causes the seller's attorney to render an unbargained-for amount of additional "explaining" to the buyer, simply to assure that the client's sale will be successfully completed.

▆▆ ▆ As to the approval of the $4,500 in attorney fees, we affirm the trial court. The decision as to what constitutes reasonable compensation for the executor's attorney is a matter which lies peculiarly within the broad discretion of the circuit court. (*In re Estate of Bonnett* (1977), 52 Ill. App. 3d 393.) On appeal, reviewing courts will not disturb the circuit court's determination of reasonable fees unless that determination is manifestly or palpably erroneous.

In this case, the executor's attorney did all that was necessary to finalize the affairs of Emil F. Weiss and to close the estate. Furthermore, the objectors stipulated that there was no question regarding the amount of time spent by the attorney for the estate and no question regarding the reasonableness of his hourly fee. They merely alleged that the majority of the attorney's efforts were spent in representation of Dorothy, individually. However, no evidence was presented to the trial court as to services to Dorothy individually, except the recording of the deed. The trial court did not find services were rendered to her individually and this is supported by the evidence. We will not disturb the trial court's ruling on this issue.

▆▆ With regard to the auctioneer's services, the evidence showed the bill had not been paid, according to Dorothy, because her co-bene-

ficiaries objected to the bill and because she also was "not happy about the bill." We believe the court below correctly determined that Dorothy had the authority to engage the services of Colonel Quick.

■ The last will and testament of Emil F. Weiss provided that his personalty be distributed in cash or in kind amongst his four children in equal shares. His codicil named Dorothy as executor and authorized her, without order of court, to distribute his estate in cash or in kind. Under the express terms of the codicil, her determination as to the value of any property distributed in kind was deemed conclusive. The bickering and quarreling of the beneficiaries prevented the contemplated distribution by the executor. In an attempt to resolve their disputes, the executor and the objectors entered into a family settlement agreement which was prepared by the objectors' attorney. Pursuant to the terms of that document, the heirs were to reach agreement regarding the value which was to be placed upon Emil F. Weiss' personal property and, in the event they were unable to agree, valuations were to be made by Colonel Quick. The objectors, therefore, cannot after such agreement be heard to complain of the employment of Colonel Quick. As to the amount of his fee, this determination lay exclusively within the discretion of the circuit court and cannot be set aside, absent manifest or palpable error. (*In re Estate of Bonnett* (1977), 52 Ill. App. 3d 393.) We find no error in this regard. Therefore, the circuit court's approval of the final account and report with auctioneer's fee of $1,271 is affirmed.

■ In light of the foregoing, we determine it was not error for the court below to direct the executor to defend the judgments appealed from and to pay the costs of such defense from estate assets.

After the filing of briefs in this court, the executor moved to dismiss the appeal in cause No. 82—648 on the ground that the appellants' brief and argument failed to meet the requirements of Supreme Court Rule 341 (87 Ill. 2d R. 341). In reviewing the brief, we determine that it addressed the issues raised. That motion is therefore denied.

For the foregoing reasons, the judgments of the circuit court of Kane County are affirmed.

Affirmed.

SEIDENFELD, P.J., and REINHARD, J., concur.